## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JUAN BARRIERA,

      Plaintiff,

v.                            Case No.  3:19-cv-387-MMH-PDB

MARK S. INCH, et al.,

      Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff Juan Barriera, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action on April 3, 2019, by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. Barriera is proceeding on an Amended Complaint (AC; Doc. 7) with exhibits (AC Exs. A-E; Docs. 7-1 through 7-5). Barriera names these individuals as Defendants: (1) Mark S. Inch, Secretary of the FDOC; (2) April Bass, a classification officer at Hamilton Correctional Institution – Annex; (3) Dalphus Johnson, former assistant warden at Hamilton Annex; and (4) Teresa Blackshear, a classification officer at Madison Correctional Institution. See AC at 3-4; see also Barriera's Notice of Partial Compliance (Doc. 20). He sues each Defendant

in their individual and official capacities. <u>See</u> Order (Doc. 46).[1] Barriera alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when they failed to take reasonable steps to protect him from known dangers at Hamilton Annex. AC at 13-17. As relief, he requests "$500,000 and or any other remedy the Court deems just and proper," including "court filing fees and costs of copies." <u>Id.</u> at 6.

This cause is before the Court on Defendants' Motion for Summary Judgment (Motion; Doc. 49) with exhibits (Motion Exs. A-J; Docs. 49-1 through 49-10). The Court advised Barriera of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and allowed him to respond to the Motion. <u>See</u> Order of Special Appointment (Doc. 11). Barriera filed a response in opposition to the Motion. <u>See</u> Plaintiff's Response to Defendants' Motion for Summary Judgment (Response; Doc. 51), with exhibits (Response Exs. A-G; Docs. 51-2 through 51-8). The Motion is ripe for review.

---

[1] After filing the Amended Complaint, Barriera clarified that he sues Defendants in their individual and official capacities. <u>See</u> Doc. 39.

## II. Facts[2]

Barriera's claims against Defendants arise from a June 18, 2018 incident at Hamilton Annex, in which another inmate, Danteus Reese, hit Barriera in the head with a metal lock, resulting in injuries so severe that medical airlifted Barriera to the hospital where he spent multiple days in the ICU. See generally AC. He alleges that before this attack, Defendants were aware Barriera faced a substantial risk of serious harm at Hamilton Annex, and that they violated his Eighth Amendment rights when they failed to protect him from the inmate attack. Id. In support of this contention, Barriera details a history of alleged gang-related threats and abuse he has endured while in FDOC custody. See generally id. For context, the factual details of Barriera's allegations are discussed in chronological order below.

Barriera's AC begins with assertions about an incident that occurred on August 14, 2015 while he was housed at Hamilton Annex. See AC at 13. Barriera states that on that date, he asked his cellmate, Kelly Dinkins, and Dinkins's friends to leave his cell because they were smoking "K2 and cigarettes." Motion Ex. D at 7. Barriera asserts he then took a nap in his assigned cell and while he was asleep, Dinkins, "a single inmate belonging to

---

[2] As discussed below, because this case is before the Court on Defendants' Motion for Summary Judgment, the recited facts, and all reasonable inferences therefrom, are viewed in the light most favorable to Barriera. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

a gang, [along with] other inmates of the same gang" seriously assaulted Barriera using "a security lock." AC at 13. Following the attack, prison officials sent Barriera to the hospital where he received thirteen stitches and other medical treatment for lacerations and injuries to his head, face, and body. See id. at 13. Officer Gary L. Yoder, then issued a disciplinary report charging Barriera with violating prison rules on fighting. Id. at 13; Motion Ex. D. Barriera alleges that prison officials issued the disciplinary report to "cover up" the unprovoked and violent nature of the attack and "to cover up" that he was assaulted by "a known gang member and his affiliated gang members." See AC at 13; Response at 1.

Following the altercation, Barriera requested that officials place him under protective management. Motion Ex. E at 1. On August 25, 2015, Sergeant Ashley B. Lee issued a report about Barriera's protective management request. Id. at 1-5. In the report, Lee summarizes Barriera and Dinkins's statements about the attack.

> SYNOPSIS: On August 15, 2015 Inmate Barriera, Juan DC# 631109 was placed in Administrative Confinement pending Protective Management by Captain N. Collins. Inmate Barriera was assaulted by inmate Dinkins, Kelly DC# 137093 and stated he was in fear for his life from this inmate.
>
> NARRATIVE: Inmate Barriera, Juan DC# 631109 was interviewed and provided a written statement on August 20, 2015 at 9:00AM. "Around 3:40PM inmate Barriera was sleeping and believes it was count time.

While inmate Barriera was sleeping his roommate hit inmate Barriera on the head. He may have been out for at least 30 seconds maybe when inmate Barriera tried to get up his roommate hit him in the face and then grabbed inmate Barriera from behind on his neck cho[]king him, and trying to run inmate Barriera's face into the wall. Inmate Barriera remembers that he was on the floor bleeding a lot and still a little dizzy from several hits and being cho[]ked. Inmate Barriera believes his roommate may have been mad, because for several days inmate Barriera has been telling him to stay out of the cell with his friends smoking K-2. Inmate Barriera just tried to keep inmates from hanging out smoking K-2 in the cell while he was sleeping it may have been count because the door was closed and inmate Barriera couldn't get out until the door was open. And was taken to the shower to clean up the blood all over him."

On August 20, 2015 Inmate Dinkins, Kelly DC# 137093, was interviewed and provided a written statement. "Like I said in my last two statement forms he has no respect for his roommates that's the bottom line, he asked for what he got so we fought."

On August 20, 2015 Officer G. Yoder, was interviewed and provided a written statement. "Inmate Barriera, Juan DC# 631109 approached me with a wash cloth on his head stating[:] Me and my roommate were in a fight, inmate Dinkins, Kelly DC# 137093."

. . .

Inmate Barriera will remain in administrative confinement pending protective management review by the Institutional Classification Team. Inmate Barriera and inmate Dinkins had injuries see attached DC4-708 Diagram of Injury as well as DC4-701 C Emergency room Record. Inmate Barriera refused to tell me who the inmates were that kept coming into his cell.

Id. at 1-2. According to Barriera, on September 11, 2015, "after [Barriera's] reported gang activity involvement, [and] in relation to the 'particular name of the gang," the warden and "head classification" officer approved Barriera's protection transfer request and transferred him to Madison CI. Response at 2; AC at 13-14; Motion Ex. D at 8.

After being housed at Madison CI for more than two years without incident, officials approved Barriera's request for a "good adjustment transfer" to Zephyrhills. See Motion Ex. G at 9; see also AC at 14. But in March 2018, before officials could transfer him to Zephyrhills, Barriera requested that officers place him under protection status because "the same gang inmates that were at Hamilton C.I. Annex were at Madison C.I. and they wanted to stab Inmate Barriera in light of the incident that occurred on 8/14/2015." AC at 14; Motion Ex. G at 11. In his deposition, Barriera testified that the dispute began when gang members at Madison CI accused Barriera of being "a snitch" and told Barriera "that [he] need[ed] to leave the dormitory" after he informed officers that his cellmate was smoking K2 and throwing up. Motion Ex. G at 10. He also testified that members of another gang, the "Latin Kings," told Barriera he had to leave the dormitory. Id. He explained:

> And then due to the other gang member Latin King, because they -- some of them knew about what happened to me in the other institution, because some of them that I knew from other camps had brought

them to their attention what happened to me, but they kept it to theirself [sic], because I'm a Latin inmate, but I'm not part of no gang members. I hate gang members. Never been part of no gang members in the street, and I ain't no gang member in prison. But since I'm an in [sic] -- Spanish inmate, they always look out for Spanish inmates, and they try to talk to the other inmates to don't do nothing to me, but they didn't want to listen. They wanted me to pay money, and I wasn't going to pay no money to stay in the dormitory so I had to leave.

Id. On March 12, 2018, Sergeant Michael Roberts prepared for the classification supervisor a memorandum about Barriera's protective management status. Motion Ex. F. It provides the following in relevant part:

On March 7, 2018 Inmate Barriera, Juan DC# 631109 was placed in Administrative Confinement pending Protective Management Review by the ICT based on his request for protection.

Inmate Barriera submitted a Witness State[me]nt Form DC6-112C by stating, . . . "on 3-3-18 I was in bunk E1133-s. the inmate in E1134-s s[tart]ed throwing up all over himself and on inmate [B]arrier[a] bunk – inmate [B]arrier[a] went to the officer Bradley about the inmate throwing up on his bunk from s[m]oking k2. Officer Bradley called security (9) and the inmate was taken to medical. Since the inmate is from a gangmember [sic] – his brothers wanted him to leave the dormitory – since the inmate was released back to the dorm from medical. Inmate [B]arriera was able to stay in e1 dormitory. Now on 3-4-18 after e1-dormitory was finished from being shake down – inmate [B]arriera went back to the (kiosks) computer to finish his email to his family. Inmate [B]arriera was writing to his family in the computer that he was in the dormitory with a lot of trouble makers gang members and k2 smokers – one

> of the gang members seen what inmate [B]arriera was
> writing in the (kiosk) computer – made him take it off,
> and told inmate [B]arriera to pack his things, because
> he was leaving e1-dormitory, because they didn't want
> him in the dormitory, after that one inmate seen
> inmate [B]arriera about he being in the dorm with a
> trouble makergang [sic] member – he told the other
> gang members who wanted him to leave the first time,
> because of the inmate who was throwing up around on
> himself and on inmate [B]arriera bunk. Inmate
> [B]arriera been in e1-dormitory for 2 and ahalf [sic]
> years without any trouble – I don't want to leave
> Madison C.I. – but I also don't want to get stabbed up
> by these gang members who are stabbing inmates all
> the time. They told inmate [B]arriera that he better
> not come back to the dorm or to k-dorm either – th[e]n
> inmate [B]arriera was placed in PC confinement,
> because he didn't want any trouble from these gang
> members in e1-dormitory."

Motion Ex. F. Because of his protection request, Barriera met with Madison

CI's "ICT team," which consisted of the "head of classification, [the] assistant

warden, and the major," who moved Barriera to confinement and advised they

would speak to the state classification officer about him transferring

institutions. Motion Ex. G at 11.

On April 4, 2018, Barriera received notification that the Madison CI

state classification officer revoked Barriera's good adjustment transfer. AC Ex.

B at 2. The next day, on April 5, 2018, Barriera submitted an informal

grievance to the state classification officer at Madison CI, arguing that officials

should reinstate his good adjustment transfer. Id. at 3. He stated the following:

8

> Inmate Barriera was place[d] in confinement on
> protection for his own safety because several gang
> members who wanted to stab[] him in e-dormitory
> where he was housed for 2 years and a half without no
> trouble until security decided to house all gang
> members together in e-dormitory. Inmate Barriera
> believes that his good adjustment transfer should be
> restored . . . .

Id. at 4. On April 6, 2018, Defendant Blackshear approved the request, explaining:

> Your good adjustment transfer was cancelled due to a
> resolve protection transfer. Your good adjustment can
> be re-instated by your classification officer.

Id. at 3. Barriera alleges that Defendant Blackshear then transferred him back to Hamilton Annex on April 17, 2018. See AC at 14; Response at 3. According to Barriera, although "the attacker that beat Inmate Barriera with the security lock was not there," officials ultimately "placed [Barriera] in open population with some of the gang members that had assaulted him at Hamilton C.I. Annex back in August 14, 2015." See AC at 14. Barriera testified during his deposition that upon his return, he advised an unknown classification officer that he should not have been transferred back to Hamilton Annex. Motion Ex. G at 11. She responded that "he was back in that institution because that inmate that assaulted [him] . . . wasn't there anymore." Id. Barriera then advised her that multiple inmates previously attacked him at that institution, though he did

not know the other inmates' names, and explained that the institution failed to properly investigate all the inmates involved. Id. at 11-12.

According to Barriera, "around April 20th," he advised Defendant Bass about the danger he felt at Hamilton Annex. Id. at 12. He testified that he advised Bass about the prior attack and explained to her that he had seen some of the same inmates who previously attacked him housed in another Hamilton Annex dorm. Id. at 12. Bass responded that officials transferred Barriera back to Hamilton Annex because the inmate who assaulted him was no longer there. Id.

Barriera then began filing grievances about feeling unsafe at the facility. Id. On April 23, 2018, Barriera submitted an informal grievance to the state classification officer at Hamilton Annex, again requesting that his good adjustment transfer be reinstated. Response Ex. B at 2. He advised officials that his confinement at Madison CI was not punitive, but protective as "several gang members wanted to stab[]" him and asserted that he should not have been transferred back to Hamilton Annex "because of several injuries he received" there in 2015. Id. at 3. Defendant Bass responded to the grievance on April 30, 2018, stating, "Your grievance has been received, reviewed and evaluated. Our records reflect that your good adjustment transfer is approved." Id. at 2.

On May 16, 2018, he filed another informal grievance with Hamilton Annex's classification officer, which stated the following in relevant part:

> Inmate Barriera states that on (10-29-12) he was
> place[d] in confinement under protection at Taylor CI,
> because inmate Barriera had been jumped by several
> Jitterbugs gang members, canteen and personal items
> stolen from his locker and nothing was never down
> [sic] about it.[3] Then on (12-7-12) inmate Barriera was
> transfer[red] from Taylor CI and arrived here and
> Hamilton CI – where inmate Barriera was taken to a
> medical emergency and taken to a[n] outside hospital
> to be hospitalize[d] for several bad injur[ies] on (8-14-
> 15) for being hit on his head, face and body and was
> also placed with a neck brace after being jumped and
> hit with a lock by several other inmates – where it was
> never proper[ly] investigated by higher officers []; but
> was truly hospitalize[d] for those bad injuries. Inmate
> Barriera then was place[d] in confinement under
> protection with these injur[ies]. Then transfer[red] to
> Madison CI on (9-11-15) where he was also placed in
> confinement under protection by security 9, on (3-4-18)
> because several of the same gang member[s] wanted
> to stab[] inmate Barriera for no reason.
>
> Barriera states and believes that he never should have
> been transfer[red] or return[ed] back to . . . Hamilton
> CI, where inmate Barriera was injured and
> hospitalize[d] for several bad injuries that almost
> caused him his life on (8-14-15). . .
>
> Barriera believes that he never should[] have been
> transfer[red] . . to Hamilton CI – where [he] received
> serval bad injuries by gang members . . . .

AC Ex. at C at 2-3. On May 23, 2018, Defendant Bass acknowledged Barriera's

prior attack at Hamilton Annex, but denied his request for a transfer:

> Our records reflect that you were transferred on 9-11-
> 15 to resolve your needed protection. Transfer was

---

[3] Barriera does not reference an October 29, 2012 gang-related attack in his AC, but
he does reference it in his deposition and May 16, 2018 informal grievances.

> based on an assault in which you were the victim. You were special reviewed against your attackers and he is not housed at Hamilton Annex. Transfer is not warranted.

Id. at 2. Following his receipt of Defendant Bass's denial, Barriera filed with Defendant Johnson a formal grievance on June 1, 2018, which again summarized his August 14, 2015 attack and stated that officials should not have transferred him back to Hamilton Annex because the "gang members who [were] never caught" "may still be housed" at the facility. Id. at 4; AC at 14. He alleged that prison officials "never proper[ly] investigated to catch the other inmates but only the one who hit [] Barriera on the head with the lock – which may not be housed at Hamilton Annex anymore." AC Ex. C at 4. He asked that officials transfer him "away from this region – where he keeps running into these same gang members who one day may take his life." Id.

On June 18, 2018, after Barriera tried to notify prison officials about his safety concerns, "he was sitting in the TV room of G-Dorm, Wing 3, when one of the inmates belonging to the gang that had assaulted him at Hamilton C.I. Annex, came up from behind [] Barriera with a security lock and started to beat him in the head." AC at 15. In his sworn deposition, Barriera explained that the inmate who attacked him on June 18, 2018 was his cellmate. Motion Ex. G. Barriera described the interactions he had with his cellmate preceding the attack as follows:

[W]hen I arrive at Hamilton . . . I was placed in a cell by myself. · From about -- from April 17th until, I don't know, they brought the inmate about a week before I got injured and he came out of confinement. · Because he was placed in confinement, I think he was caught with a weapon, a knife or something like that he was in confinement, and they placed him into my cell.

Q Did you know him?

A No. · After a while being in my cell, I guess, some people brought to his attention or something about what happened before because he started –

Q Wait, wait, wait, you said you guess some people brought it to his attention.

A Yeah, because I don't -- I don't know if he was there when I got injured the first time. Because when he was in the cell, when he came to the cell, he started asking me questions if I was racial. If I was racial against blacks. And I mentioned to him I said, I'm not racial against blacks because I got family members that my nieces are married to that are black. In other words, no way that I'm going to be racial, you know, my uncles are black so there's no way that I'm going to be racial against you or anybody else. So he didn't say nothing else and then much later we got –

Q Much -- you said much later?

A Yeah.

Q What do you mean by that?

A Because that happened in the morning –

Q Okay.

A -- that day June 18th, we went to count and after count cleared, I don't remember what time, I came out

the cell and I come back into the cell he's in the room. · He moved my locker and everything. He's sharpening iron to make a shank. I told him, look, do me a favor, if you want to do this thing here, do it out the cell, don't do it in the cell. Because I'm trying to do my time I don't want no problems. And he's like saying, you don't tell me what to do, I'll do whatever I want. We got in a little argument, you know what I mean, I just left and left it alone, and I left the cell. And then I see him walking around kind of angry or something in the dormitory, but I never had no idea that he was going to come and struck me in my head because of that going on in the cell.

Q Well, how long had he been in your cell, I'm sorry?

A I don't know if he was there for about –

Q A week?

A -- a week or so in the cell.

Q Well, did -- did you all -- how did y'all interact during the week?

A During that week?

Q Uh-huh.

A We ain't -- we ain't never really talk in the cell.

Q Okay. · Y'all didn t have any interactions?

A No, ma'am.

Q Outside of the cell?

A No, not once outside of the cell.

Q Okay.

> A Just that day when I was sitting in the dayroom he
> just came and hit me in my head.

Motion Ex. G at 6.

Barriera's injuries were so severe that medical airlifted him to the hospital where he remained in ICU for a few days. Id. He alleges that he sustained a fractured skull, brain swelling and bleeding, a fractured eardrum, a fractured rib, and left hand and finger fractures. Id. He contends that he remains wheelchair bound because of the injuries. Id.

On June 19, 2018, the day after the attack, Defendant Johnson denied Barriera's formal grievance. Id. at 14-15. In the denial, Defendant Johnson advised Barriera that his fear at Hamilton Annex was unwarranted:

> The incident of your assault and resolve protection
> transfer from Hamilton Annex on September 11, 2015
> was thoroughly investigated. You were special
> reviewed from the inmate who assaulted you for your
> continued safety and to prevent any future problems.
> Your current housing at Hamilton CI Annex is
> appropriate. You have the option to advise staff if you
> feel your safety is at risk and you will be placed in
> administrative confinement pending a review for
> protection. Our records reflect that you are currently
> approved for a good adjustment transfer . . . .

AC Ex. C at 7.

Barriera argues that Defendants had a duty to protect Barriera from inmate-related violence. AC at 17. He alleges that Defendants Johnson, Bass, and Blackshear had specific knowledge about prior attacks on Barriera under

strikingly similar circumstances and despite that knowledge, they transferred Barriera back to Hamilton Annex and housed him in open population. Id. He contends that by failing to protect him from the inmate attack, Defendants were deliberately indifferent to a substantial risk of serious harm in violation of Barriera's rights under the Eighth Amendment to the United States Constitution. Id. at 16.

### III. Summary Judgment Standard

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381

F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. Summary of the Arguments

Barriera asserts that Defendants failed to protect him from the June 18, 2018 inmate attack even though they knew Barriera faced a substantial risk of serious harm at Hamilton Annex. <u>See</u> AC at 16. In the Motion, Defendants argue that they are entitled to summary judgment because: (A) Barriera has failed to establish a constitutional violation; (B) Barriera has failed to establish supervisory liability on behalf of Defendants Inch and Johnson; (C) Barriera is not entitled to damages against Defendants in their official capacities; and (D) Defendants are entitled to qualified immunity.[4] <u>See generally</u> Motion. In his Response, Barriera asserts that genuine issues of material fact preclude summary judgment. Response at 11. He argues that Defendants knew of the

---

[4] The Motion also includes a section titled "Grievance Liability," but Defendants fail to present argument in that section. Motion at 15-16. Instead, they allege that Defendants Blackshear, Bass, and Johnson merely responded to Barriera's grievances. <u>Id.</u> Because Defendants use those same facts to argue that Barriera has failed to establish a constitutional violation, <u>see id.</u> at 15, the Court addresses the facts in the "Grievance Liability" section of the Motion in its analysis of the sufficiency of Barriera's claims of constitutional violations.

risk that Barriera faced at Hamilton Annex, <u>see</u> <u>id.</u> at 13-16; they are not entitled to qualified immunity, <u>see</u> <u>id.</u> at 18; and that Defendants are liable in their supervisory and official capacities, <u>see</u> <u>id.</u> at 16-18. He maintains that Defendants "clearly violated the Eighth Amendment" and requests that the Court deny Defendants' Motion. <u>Id.</u> at 18.

## V. Law and Conclusions

### A. Eighth Amendment Failure to Protect

Defendants Blackshear, Bass, and Johnson argue they are entitled to summary judgment on Barriera's individual capacity claims against them because he fails to establish that they violated his constitutional rights.[5] They argue that they "did not know that [Barriera] was in danger at Hamilton CI, an[d] thus did not actually know that [Barriera] faced a substantial risk of serious harm." Motion at 13-14. They also allege that "Defendants knew [Barriera] had been injured before at Hamilton CI; however, they believed that the risk to which the facts gave rise was insubstantial or nonexistent, which is not sufficient to support a finding that their actions caused [Barriera's] subsequent injury." <u>Id.</u> at 14. According to Defendants, "the attack [was] not gang related or motivated," but rather Barriera's cellmate merely attacked him

---

[5] It appears that Barriera's individual capacity claims against Defendant Inch are only related to his supervisory role as Secretary of the FDOC. <u>See generally</u> AC; Response. Thus, in this section, the Court only addresses the individual capacity claims against Defendants Blackshear, Bass, and Johnson. The Court addresses Barriera's individual capacity claims against Defendant Inch in the "Supervisory Capacity" section of this Order.

after they had an upsetting interaction. Id. They assert that the cellmate who attacked Barriera was not in prison during Barriera's first attack at Hamilton Annex, and further maintain they had no way of knowing Barriera "would engage in an argument with his cellmate and be attacked by his cellmate." Id. They argue that "[a]ny prisoner could suffer the same fate." Id. They also argue that "none of the Defendants took part in transferring [Barriera] to Hamilton CI"; and that their participation in Barriera's grievance process does not prove actual knowledge. Id. at 15-17. To support their argument, Defendants rely on the Declarations of Defendants Bass, Blackshear, and Johnson; as well as Barriera's deposition testimony. Id. at 15; Motion Exs. A, G.

In his Response, Barriera argues that Defendants had the required subjective knowledge of the substantial risk of serious harm for which Barriera faced at Hamilton Annex. Response at 2. He notes that he has been in and out of protective custody for "reported gang activity involvement, in relation to the 'particular name of the gang'" since 2015, and his history of prison transfers and "special reviews" shows Defendants' knowledge. Id. at 2-3. He also asserts that Defendants' failure to initiate a "regional transfer" led to Barriera's attack. Id. at 3. He argues that "Defendants failed to review the Gang Sergeant's incident report, which identified the name of the 'gang' the assailant belonged to." Id. at 12. According to Barriera, "[t]he Gang Sergeant had a list of all the names of the gangs in Hamilton CI . . . [and] [h]ad the Defendants

20

reviewed the report . . .," they would have learned that the assailant was a member of the same gang that previously attacked Barriera at Hamilton Annex. Id. at 12-13. Thus, Barriera maintains that a genuine dispute of material fact exits as to Defendants' knowledge of the risk of harm and they failed to alleviate that risk. Id.

The Eighth Amendment imposes duties on prison officials to "'take reasonable measures to guarantee the safety of the inmates.'" Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1319 (11th Cir. 2016) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). To survive summary judgment on a § 1983 deliberate indifference claim for a failure to protect, Barriera must show (1) a substantial risk of serious harm; (2) a deliberate indifference to that risk; and (3) a causal connection between Defendants' conduct and the constitutional violation. Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019); see also Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

The second element – whether a defendant was deliberately indifferent to a substantial risk – requires both an objective and a subjective analysis. See Estate of Owens v. GEO Group, Inc., 660 F. App'x 763, 767 (11th Cir. 2016). The Eleventh Circuit has explained:

> With regard to the subjective component of the Eighth Amendment claim, the Court in Farmer held that the prison "official must both be aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. The Court also held: "Whether a prison official had the requisite knowledge of a substantial risk is a <u>question of fact</u> subject to demonstration in the usual ways, including inference from circumstantial evidence." <u>Id.</u> at 842 (emphasis added). A prison official cannot avoid liability under the Eighth Amendment "by showing that . . . he did not know the complainant was especially likely to be assaulted by the <u>specific prisoner</u> who eventually committed the assault." <u>Id.</u> at 843 (emphasis added). This is because "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" <u>Id.</u> (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 35 (1993)).

<u>Rodriguez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 517 (11th Cir. 2007). As to

the third element – causation – the Eleventh Circuit has explained:

a plaintiff demonstrates the "necessary causal link" in this context where he is able to show that the prison official (1) "had the means substantially to improve" the inmate's safety, (2) "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence," and (3) had "other means [] available to him which he nevertheless disregarded."

<u>Id.</u> (quoting <u>LaMarca v. Turner</u>, 995 F.2d 1526, 1539 (11th Cir. 1993)).

Prison officials may avoid Eighth Amendment liability in one of three ways: (1) showing that they were not aware "of the underlying facts indicating a sufficiently substantial danger"; (2) admitting awareness of "the underlying facts" of a substantial danger, but believing the danger was nonexistent; or (3)

claiming to have responded reasonably to a known substantial danger. Id. at 617-18 (citing Farmer, 511 U.S. at 844).

Here, Defendants seem to rely on the first method. They assert they were unaware of underlying facts suggesting a substantial danger because the inmate who attacked Barriera on August 15, 2015 was no longer at Hamilton Annex when Barriera returned in 2018, and they did not know that another Hamilton Annex inmate would attack Barriera on June 18, 2018. Defendants also allege that the facts are "not sufficient to support a finding that their actions caused [Barriera's] subsequent injury." Motion at 14. Thus, the subjective knowledge requirement and causation are at issue.

In her Declaration, Blackshear states, in pertinent part:

> Inmate Barriera was transferred to Madison CI in 2015. I was assigned to Madison CI until April 17, 2018. On March 7, 2018, Inmate Barriera was placed in protective management at his request. On April 17, 2018, Inmate Barriera was transferred to Hamilton CI because the person with whom he engaged in a fight with, his roommate, in 2015, was no longer at the institution.
>
> I had no knowledge that Inmate Barriera would be beaten by his roommate four months later when transferred to Hamilton CI.
>
> I took no actions in the decision to transfer Inmate Barriera.

Motion Ex. A at B. Barriera says that Blackshear knew he had been in protective custody at Madison CI because of specific gang-related threats and

was supposed to ensure his protective transfer out of Madison CI. Response at 3. He asserts that "Blackshear transferred [him] back to Hamilton CI where the attackers were," and in doing so, she ignored the "Gang Sergeant's Report" identifying the name of the gang members at Hamilton Annex and the "red flag" in Barriera's "prison file." Id. Barriera states that Blackshear should have initiated a "regional transfer" to protect him from future problems with "the named gang." Id. Barriera states he informed Blackshear about the gang-related danger he faced through written grievances and in-person conversations. See Motion Ex. G at 18. Barriera submitted a grievance to Blackshear requesting his "good adjustment transfer" be recognized and advising Blackshear that "gang members" at Madison CI wanted to stab him. Response Ex. A at 3-4. Blackshear responded to that grievance, acknowledging Barriera's pending "protective transfer" because of those gang-related threats. Id. at 3.

In her Declaration, Defendant Bass states the following:

> On August 14, 2015, Inmate Barriera was involved in a fight with his roommate. As a result Plaintiff was transferred to Madison CI. Plaintiff was assigned to Madison CI until March 7, 2015, when he was placed in protective management because he was threatened for reporting his roommate to staff. On April 17, 2018, Plaintiff was transferred to Hamilton CI because the person who he was in a fight with in 2015, his roommate, 2015 [sic], was no longer at the institution.

24

> I did not have prior knowledge that Plaintiff was in danger of being struck by his roommate with a lock.
>
> I signed a grievance that Plaintiff submitted regarding the fact that he had a good adjustment transfer. See attached grievance.

Motion Ex. A. Barriera states that right after his transfer back to Hamilton Annex, he began notifying Bass about the gang-related danger he faced at the facility. Response at 4. Barriera submitted informal grievances to Bass on April 23, 2018 and May 16, 2018, advising her about his August 14, 2015 attack and stating he should not have been transferred back to Hamilton Annex and that prison officials failed to properly investigate all the gang members involved in that previous altercation. Response Ex. B at 2-5. In her response to Barriera's May 16, 2018 grievance, Bass acknowledged his previous attack and his protective transfer to Madison CI, but advised that Barriera had been "special reviewed" against his "attackers" and that the prior assailant was "not housed at Hamilton Annex." Id. at 5. Barriera argues that because Bass knew about his prior protection status and "special review," she knew about the gang-related danger Barriera faced at Hamilton Annex. Id. at 2. He also states that Bass had access to the "Gang Sergeant's incident report," which would have identified the gang members that posed a threat to Barriera and revealed that the assailant was a member of the subject gang and housed at Hamilton Annex. Response at 6,12

In his Declaration, Defendant Johnson attests to the following in pertinent part:

> On August 14, 2015, Inmate Barriera was involved in a fight with his roommate. As a result, Inmate Barriera was transferred to Madison CI. He was assigned to Madison CI until April 2018. On March 7, 2018, he was placed in protective management because [of] his request. On April 17, 2018, Plaintiff was transferred to Hamilton CI because the person with whom he engaged in a fight with in 2015, was no longer at the institution. In August 2018, Inmate Barriera was hit by his roommate with a lock.
>
> I did not have prior knowledge that Inmate Barriera was in danger of being struck by his roommate with a lock.

Motion Ex. C. Barriera asserts he notified Johnson through his June 1, 2018 grievance, seventeen days before the attack, that he faced gang-related danger at Hamilton Annex. Response at 5. In the grievance, Barriera stated that the August 14, 2015 attack was never properly investigated, the other "gang members" who participated in the August 14, 2015 attack were never caught, and that Barriera should have never been transferred back to Hamilton Annex. Response Ex. C at 2. Johnson responded to Barriera's formal grievance on June 19, 2018, the day after Barriera's June 18, 2018 attack, explaining to Barriera that he was "special reviewed from the inmate who [previously] assaulted [him]" and that his "current housing at Hamilton CI Annex is appropriate." Id. at 3. Barriera again argues that because

Johnson knew about his prior protection status and "special review," he knew about the gang-related danger Barriera faced at Hamilton Annex. He also asserts that once Johnson had notice that gang members were threatening Barriera, Johnson should have used the "Gang Sergeant's incident report" to identify the subject gang members and protect Barriera from the attack. Response at 12.

Barriera has presented sufficient evidence to create a genuine issue on the question of whether Defendants Blackshear, Bass, and Johnson had subjective knowledge of a serious threat against Barriera. See Rodriguez, 508 F.3d at 621 (finding prison officials had subjective knowledge of danger to inmate because he provided specific information about threats from gang members). Barriera provides evidence of a 2015 attack at Hamilton Annex; that the attack was gang related; he has been in and out of protective custody since 2015; and that he made Defendants Blackshear, Bass, and Johnson aware of the gang-related danger he faced at Hamilton Annex in 2018. He further alleges that each Defendant had access to the "General Sergeant's" incident or gang report that identified the gang members that posed a threat to Barriera and that the June 18, 2018 assailant was listed on that report. Defendant's argument that the June 18, 2018 attack was not gang related but merely a dispute between cellmates presents a factual dispute for resolution by a jury. Further, the fact that Defendants Blackshear, Bass, and Johnson

deny that Barriera reported threats of gang-related violence and fear (or suggest his sworn statements lacks credibility) to them provides insufficient grounds on which to grant summary judgment in their favor.

Barriera has also presented sufficient evidence to create a genuine issue for trial on the question of whether Defendants Blackshear, Bass, and Johnson's actions (or inactions) caused Barriera's injuries. As mentioned above, Barriera alleges that upon learning of the threat at Hamilton Annex, each Defendant could review the "Gang Sergeant's incident report" to identify the gang members who posed a threat to Barriera, that the assailant was listed on that report, and that each Defendant could begin the appropriate transfer. Response at 12. Indeed, during his deposition, Barriera testified that "the warden" and "the head of classification" approved his 2015 protective transfer to Madison CI, see Motion Ex. G at 8, and that the "assistant warden" and "head of classification" approved his 2018 protective transfer back to Hamilton Annex, see id. at 11. Blackshear, Bass, and Johnson argue they did not participate in Barriera's 2018 transfer to Hamilton Annex, and instead assert they merely responded to Barriera's grievances. See Motion at 15-17. However, a reasonable jury could infer that Bass or Blackshear, as state classification officers, and Johnson, as the assistant warden, had the means to improve Barriera's safety if only by removing him from open population at Hamilton Annex and putting him in protective confinement. See Response at

15. See Rodriguez, 508 F.3d at 619-20 (finding that prison officials did not reasonably respond to threats against inmate where, although lacking ultimate authority to transfer, they could begin process for protective transfer). Thus, a reasonable jury could conclude that these Defendants' inactions caused Barriera's June 18, 2018 injuries.

In sum, the parties provide significantly different accounts of the relevant threats of physical violence that Barriera faced. Thus, the Court finds that there remain genuine disputes of material fact and Defendants' Motion is due to be denied as to Barriera's failure to protect claims against Defendants Blackshear, Bass, and Johnson.

## B. Supervisory Liability

Defendants Inch and Johnson argue they are entitled to summary judgment on Barriera's individual capacity claims against them because they cannot be held liable based on respondeat superior. Motion at 16-17. Supervisory officials cannot be held vicariously liable under § 1983 for the unconstitutional acts of their subordinates. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) abrogated in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010). Instead, a supervisor can be liable only when that supervisor "personally participates in the alleged unconstitutional conduct or when there is a causal connection" between the supervisor's actions and the constitutional deprivation. Id.

"The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown [v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)]. A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez [v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003)], or that a supervisor's "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008) (overruled on other grounds as recognized by Randall, 610 F.3d at 709).

As explained above, Barriera has presented evidence which if accepted by a jury, could support a finding that Defendant Johnson was personally involved in, or otherwise causally connected to, the alleged violations of Barriera's constitutional rights. On this record, there remains a genuine issue of material fact as to the extent of his involvement and whether the alleged violations could have been prevented. Thus, Defendants' Motion is due to be denied to the extent that Barriera raises claims of supervisory liability against Johnson.

As to Defendant Inch, Barriera does not argue Inch personally participated in any unconstitutional conduct, and thus, the viability of his supervisory claims depends on whether he plausibly alleges a causal connection between Inch's actions and the alleged constitutional deprivation. In his deposition, Barriera testified that he named Inch as a Defendant because he "was told that when you file a complaint against the Department of Corrections, [] you had to place his name on the . . . claim." Motion Ex. G at 12-13. Barriera does not allege facts showing a history of widespread abuse or that Inch has implemented a policy or custom of violating an inmate's Eighth Amendment rights. Thus, Defendants' Motion is due to be granted as to Barriera's claims of supervisory liability against Defendant Inch.

### C. Eleventh Amendment Immunity

Defendants argue that Barriera's claims for monetary damages against them in their official capacities should also be dismissed, because they are entitled to Eleventh Amendment immunity. Motion at 18. The Court agrees. See, e.g., Hayes v. Sec'y, Fla. Dep't of Children & Families, 563 F. App'x 701, 703 (11th Cir. 2014) ("The Eleventh Amendment also prohibits suits against state officials where the state is the real party in interest, such that a plaintiff could not sue to have a state officer pay funds directly from the state treasury for the wrongful acts of the state."). Thus, Defendants' Motion is due to be

granted to the extent that Barriera requests monetary damages from Defendants in their official capacities.

## D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity with respect to Barriera's Eighth Amendment failure to protect claims. See Motion at 18-19. "Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'" Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (citation omitted). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, an official must first establish that his conduct fell within his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007). Here, the parties do not dispute that Defendants were acting within their discretionary authority. Thus, the burden

shifts to Barriera to show that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). The first inquiry is, taken in the light most favorable to the non-moving party, "do the facts alleged show the officer's conduct violated a constitutional right?" <u>Id.</u>; <u>see also</u> <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 377 (2007)). If the court finds that a violation of a constitutional right has been alleged based on the plaintiff's version of the facts, then the next question is whether the right was clearly established at the time of the violation. <u>Saucier</u>, 533 U.S. at 201; <u>Scott</u>, 550 U.S. at 377. The court must undertake this second inquiry "in light of the specific context of the case, not as a broad general proposition." <u>Saucier</u>, 533 U.S. at 201.

As discussed above, viewing the facts in the light most favorable to Barriera as the Court must, genuine issues of material fact are present with respect to whether Defendants Blackshear, Bass, and Johnson exhibited deliberate indifference to a serious risk of harm of which they were subjectively aware and whether their action or inaction caused harm to Barriera.[6] Indeed, according to Barriera's version of the facts, Defendant Blackshear transferred Barriera to Hamilton Annex despite knowledge that Barriera would be subject

---

[6] Because the Court finds that Defendants' Motion is due to be granted as to Barriera's individual and official capacity claims against Defendant Inch, the Court need only address qualified immunity as it relates to Defendants Blackshear, Bass, and Johnson.

to gang-related violence at that facility, and following his transfer to Hamilton Annex, Defendants Bass and Johnson allowed Barriera to remain in open population despite knowing gang members wished to harm him. Thus, the Court has determined, for purposes of summary judgment, that Barriera has provided sufficient facts to support a violation of his Eighth Amendment right to be free from cruel and unusual punishment.

Next, the Court must determine whether the law was clearly established at the relevant time period. "[T]he eighth amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection" when a prison official becomes "aware of a threat to an inmate's health and safety." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990). When prison officials are "deliberately indifferent to a known danger . . ., their failure to intervene offend[s] 'evolving standards of decency' [and] ris[es] to the level of a constitutional tort." Id. (citing Estelle v. Gamble, 429 U.S. 97, 105-06, 97 (1976)). Indeed, the Eighth Amendment right of prisoners to be free of deliberate indifference by prison officials resulting in harm was clearly established at the time of the events in this case. See Hudson v. McMillian, 503 U.S. 1, 8 (1992). Given this precedent, Defendants were on notice that failing to respond to a known threat to Barriera's safety was unlawful. Thus, at this time, Defendants are not entitled to qualified immunity.

Accordingly, it is

**ORDERED:**

1.     Defendants' Motion for Summary Judgment (Doc. 49) is **GRANTED** as to Barriera's supervisory liability claims against Defendant Inch and as to Barriera's claims for monetary damages against all Defendants in their official capacities.

2.     Defendants' Motion for Summary Judgment (Doc. 49) is **DENIED** in all other respects.

3.     Defendant Inch is **DISMISSED** from this action. The Clerk shall terminate him as a Defendant.

4.     By May 4, 2021, the parties shall confer in good faith in attempt to resolve the remaining claims. If the parties reach a settlement, they shall promptly notify the Court. If the parties cannot settle the claims privately, Defendants shall file a notice advising whether the parties believe a settlement conference with the United States Magistrate Judge will be beneficial.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of March, 2021.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-7

C:     Juan Barriera, #631109
       Shirley Durham, Esq.